NATIONAL FAIR HOUSING ALLIANCE, INC., et al., Plaintiffs,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al., Defendants.

No. CIV.A. 01–2199(EGS).

United States District Court, District of Columbia.

July 9, 2002.

**48**

Stephen M. Dane, Esquire, Beth A. Wilson, Esquire, Cooper & Walinksi L.P.A., Toledo, OH.

Gary S. Thompson, Esquire, John E. Heintz, Esquire, Elizabeth Feinberg, Esquire, Lara Schwartz, Esquire, Gilbert Heintz & Randolph, L.L.P., Washington, DC.

John P. Relman, Esquire, Relman & Associates, Washington, DC.

Reed Colfax, Esquire, Eliza Platts–Mills, Esquire, Washington Lawyers' Committee for Civil Rights & Urban Affairs, Washington, DC.

C. Thomas McCarter, Esquire, Law Office of C. Thomas McCarter, Toledo, OH.

Benjamin B. Klubes, Esquire, Andrew L. Sandler, Esquire, Lily A. Camet, Esquire, Skadden Arps Slate Meagher & Flom L.L.P., Washington, DC.

## *MEMORANDUM OPINION AND ORDER*

SULLIVAN, District Judge.

Plaintiffs are non-profit organizations that promote fair housing policies and practices and three individuals from Toledo, Ohio. Plaintiffs are suing Prudential Insurance Company and Prudential Property & Casualty Company (collectively, "Prudential") under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and 42 U.S.C. § 1981, alleging that Prudential engages in policies and practices that discriminate against minority applicants for homeowners insurance. Specifically, the plaintiffs challenge the use of certain "redlining" procedures, which Prudential utilizes to deny homeowners insurance in certain areas, including the entire District of Columbia, and the use of factors such as credit history to determine eligibility for homeowners insurance.

Pending before the Court is defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). Defendants' motion to dismiss asserts four primary arguments: (1) that plaintiffs lack standing to bring this case; (2) that the FHA doesn't apply to provision of homeowners insurance; (3) that disparate impact claims are not available under the FHA, and even if they are, that plaintiffs have failed to state a disparate impact claim, and such claims should be barred by the equitable doctrine of laches; and (4) that plaintiffs have failed to state a claim pursuant to section 1981, and that the statute of limitations bars any section 1981 claims.

The Court finds that, because sections 3604 and 3605 of the FHA may be reasonably construed to apply to the provision of homeowners insurance, plaintiffs have stated legally cognizable claims under sections 3604 and 3605 of the FHA. Furthermore, because defendants' challenge to plaintiffs' standing and defendants' laches defense are based on facts outside the complaint, resolution of such issues is inappropriate at this stage of the proceedings. Accordingly, after careful consideration of defendants' motion to dismiss, the response and reply thereto, the argument of counsel, and the applicable statutory and

case law, the Court denies defendants' motion to dismiss.

## I. Procedural History

Plaintiffs in this matter are National Fair Housing Alliance, Inc. ("NFHA")[1], Housing Opportunities Made Equal of Richmond, Inc. ("HOME"), Fair Housing Council of Suburban Philadelphia ("FHCSP"), Toledo Fair Housing Center ("TFHC"), Metropolitan Milwaukee Fair Housing Council, Inc. ("MMFHC") (together, "Fair Housing Group plaintiffs"), and Dr. Monica Holiday–Goodman, Justina Alsup, and Robert Scales (together, "Individual Plaintiffs"). The Fair Housing Group plaintiffs are all non-profit organizations that work to promote fair housing in their respective geographic areas across the United States.

In September 1997, the Fair Housing Group plaintiffs, with the exception of FHCSP, filed a Housing Discrimination Complaint against Prudential with the U.S. Department of Housing and Urban Development ("HUD") alleging that Prudential discriminates against African–American and Hispanic homeowners and prospective homeowners through several underwriting practices and policies, many of which are challenged in this lawsuit. FHCSP filed a similar HUD action against Prudential in October 2001. The HUD complaints allege that Prudential's discriminatory acts constitute a continuing violation of the FHA. Efforts to mediate the HUD complaint filed by the Fair Housing Group plaintiffs have not been successful.

On October 23, 2001, plaintiffs filed this lawsuit against Prudential. On December 20, 2001, defendants filed a motion to dismiss.

## II. Factual Allegations

In reviewing a motion to dismiss under Fed.R.Civ.P. 12(b), the Court must assume the factual allegations pled by the plaintiffs to be true. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C.Cir. 2000). Therefore, the Court briefly reviews the facts alleged in plaintiffs' complaint.

Plaintiffs detail allegedly discriminatory polices and practices of Prudential, claiming that Prudential had discriminated, and continues to discriminate, on the basis of race and color, in the provision, terms and conditions of its homeowners insurance products.

In the areas of the country served by the Fair Housing Group plaintiffs, homeowners are typically required to have homeowners insurance coverage in order to qualify for a mortgage or home equity loan, and must maintain insurance for the life of the loan. Compl. ¶ 32. Thus, plaintiffs allege, adequate and cost-effective homeowners insurance is necessary to home ownership. *Id.*

Different types of homeowners insurance exist. For example, a "market value" policy generally only will insure up to the home's market value. *Id.* ¶ 31. A "replacement cost" policy commonly covers the costs of replacing the house, in the event of damage to the physical structure of the home, and "guaranteed replacement cost" provides broader replacement coverage, typically replacing the home using "substantially similar" materials. *Id.* The complaint notes that many homeowners prefer replacement cost or guaranteed cost coverage because the cost to replace a home that is destroyed or severely damaged may be greater than the home's market value. *Id.* ¶ 35. In particular, older homes in urban areas generally would

1. The NFHA is a nation-wide alliance of pri-       vate, non-profit fair housing groups.

have replacement costs that exceed their market values. Prudential offers various types of homeowners insurance policies, including "market value policies," and "replacement cost" and "guaranteed replacement cost" policies. *Id.*

Plaintiffs claim that Prudential, for several years, has engaged in and continues to engage in discriminatory "redlining" with respect to homeowners insurance throughout the country. Specifically, plaintiffs allege that certain minimum underwriting requirements for certain types of coverages, such as a "replacement cost" policy, have a discriminatory impact on past, present and prospective African–American and Hispanic homeowners in predominantly African–American and Hispanic neighborhoods. *Id.* ¶¶ 3, 44. According to plaintiffs, Prudential's requirements are not justified or supported by business necessity or actuarial data and there are less restrictive, non-discriminatory alternatives available to meet any legitimate business objectives. *Id.* ¶ 55.

Plaintiffs have "tested" Prudential to identify practices and policies that are implemented and maintained by the company, and which have a discriminatory impact on minority homeowners, or which represent disparate treatment on the basis of race or intentional discrimination. *Id.* ¶¶ 62–63. Plaintiffs contend that Prudential maintains underwriting policies that disparately affect minority homeowners and minority neighborhoods. *Id.* ¶¶ 44–56. They identify the following policies:

(1) Prudential's minimum underwriting requirements for obtaining replacement cost coverage include the age of the home, the market value of the home and the difference between the replacement cost and the market value;

(2) Since 1994, Prudential does not have a policy of selling homeowners insurance policies in the District of Co-

lumbia; to the extent that Prudential has re-entered the District, it has done so for select clients and without notice to the D.C. Insurance Commissioner or the public;

(3) Prudential rates territories by segregating neighborhoods into zones that reflect their racial composition;

(4) Prudential uses credit scores or credit ratings of applicants to determine eligibility for homeowners insurance policies.

*Id.* at ¶¶ 45–54.

Plaintiffs claim that Prudential has long known that its underwriting guidelines and policies have a disparate impact on the basis of race, but has deliberately chosen not to remedy the discriminatory conduct. *Id.* ¶ 57. As such, plaintiffs claim that Prudential has engaged in intentional discrimination on the basis of race by continuing to utilize these guidelines and policies. *Id.*

Plaintiffs also contend that Prudential's practices demonstrate disparate treatment of minority homeowners. In particular, Prudential points to the following alleged practices as evidence of intentional discrimination and disparate treatment on the basis of race:

(1) Prudential does not apply underwriting rules consistently to existing and potential homeowners in African–American and Hispanic neighborhoods;

(2) Prudential has chosen to place no or relatively few agent offices in predominantly African–American and Hispanic neighborhoods, as compared with other neighborhoods;

(3) Prudential has utilized sales techniques and practices that discourage existing or potential homeowners in African–American and Hispanic neighborhoods from purchasing

homeowners insurance (e.g., poor agent responsiveness, not providing price quotes by telephone or by mail);

(4) Prudential has deliberately failed to train agents in anti-discrimination and equal opportunity laws, or in the benefits of assisting African–American and Hispanic customers in predominantly African–American and Hispanic neighborhoods.

*Id.* ¶¶ 57–66.

The individual plaintiffs, Dr. Monica Holiday–Goodman, Justina Alsup and Robert Scales, own houses in Toledo, Ohio. *Id.* ¶¶ 78–80. All of the individual plaintiffs are African–American, and own homes in neighborhoods that are, or were, predominantly African–American. *Id.* Both Dr. Holiday–Goodman and Ms. Alsup applied to Prudential for homeowners insurance in April 1997. *Id.* ¶¶ 78, 79. Prudential initially told Dr. Holiday–Goodman that no agent was assigned to her address. *Id.* ¶ 78. Later, when Dr. Holiday–Goodman was able to speak with a representative, she was told that, if the market value of her home was less than 50% of its replacement cost, she could not purchase either a market value policy or a replacement value policy. *Id.* She was directed to the Ohio Fair Plan. Dr. Holiday–Goodman asked that Prudential mail her a quote for a market value policy, but never received such a quote. *Id.* On February 6, 1998, she filed a complaint against Prudential with HUD, which is still pending. *Id.*

Mr. Scales had a similar experience. A Prudential agent told Mr. Scales that the company could not insure his house because of the differential between the market value and the cost of replacing the house if it were to burn down. *Id.* ¶ 80. The market value of his house was $41,500; when he called the toll-free number for Prudential, to which he was referred, he was told that there was a $50,000 minimum value for market value coverage. *Id.* On July 29, 1997, Mr. Scales filed a HUD complaint against Prudential, which is still pending. *Id.*

Ms. Alsup was told by Prudential that she would have to pursue the Ohio Fair Plan because she had no insurance history, and that Prudential required two or three years of insurance history. *Id.* ¶ 79. On December 8, 1997, Ms. Alsup filed a HUD complaint against Prudential, which is still pending. *Id.* ¶ 79. The complaint states that Ms. Alsup still owns a house in Toledo, but now resides in Las Vegas, Nevada. *Id.* ¶ 26. The complaint does not indicate when Ms. Alsup moved to Nevada.

## III. Discussion

Defendants' motion to dismiss raises four primary arguments. First, defendants argue that plaintiffs lack standing to bring the instant lawsuit. Second, Prudential contends that the FHA does not apply to the provision of homeowners insurance. Third, Prudential argues that disparate impact claims are not cognizable under the FHA, and that plaintiffs fail to sufficiently state a claim of discrimination based on disparate impact. Finally, defendants challenge the sufficiency and timeliness of the individual plaintiffs' section 1983 claims.

### A. Standard of Review

Fed.R.Civ.P. 8(a)(2) requires only that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." In *Sparrow v. United Air Lines, Inc.,* the D.C. Circuit held that, in an employment discrimination case, "plaintiff need not set forth the elements of a prima facie case at the initial pleading stage". 216 F.3d 1111 (D.C.Cir. 2000). The Supreme Court recently emphasized that, to survive a motion to dismiss for failure to state a claim, a plaintiff

need not plead facts beyond those which would " 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Swierkiewicz v. Sorema,* 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

The Court will not grant a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99; *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). Accordingly, at this stage of the proceedings, the Court accepts as true all of the complaint's factual allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *accord Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1102 (D.C.Cir.1985). Plaintiff is entitled to "the benefit of all inferences that can be derived from the facts alleged." *Kowal,* 16 F.3d at 1276. However, the movant is entitled to judgment if there are no allegations in the complaint which, even if proven, would provide a basis for recovery. *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987).

## B. Standing

Defendants contend that plaintiff Fair Housing Group plaintiffs lack standing to bring this action.[2] Defendants argue that a generalized frustration of an organization's mission is not sufficient to establish standing. *See American Legal Found. v. FCC,* 808 F.2d 84, 92 (D.C.Cir.1987) (plaintiff organization must allege "more than allegations of damage to an interest in 'seeing' the law obeyed or a social goal furthered"). However, the Fair Housing Group plaintiffs assert an injury to their mission that arises from their expenditure of time and resources on the litigation—time and resources that have been diverted from other activities of the organizations.

The Supreme Court has held that standing to bring a FHA claim is coextensive with constitutional standing. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (citing *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). Pursuant to Article III, a plaintiff must allege an "injury in fact" that is concrete and particularized, and actual or imminent. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The injury must be fairly traceable to the challenged conduct of the defendants and it must be likely that the injury will be "redressed by a favorable judicial decision." *Id.* An organization may assert an injury in fact that arises from a drain on the organization's resources caused by the defendants' conduct (and the ensuing litigation), if the conduct results in an impairment of the organization's work and constitutes "far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp.,* 455 U.S. at 378–79, 102 S.Ct. 1114. While the D.C. Circuit has suggested that money spent on "testing" is, by itself, insufficient to establish standing because such harm is "self-inflicted," *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.,* 28 F.3d 1268, 1276–77 (D.C.Cir. 1994), the Circuit also suggested that, if the defendants' conduct caused independent harms to other programs of plaintiff organizations, sufficient injury would exist. *Id.*

---

**2.** Defendants do not challenge the standing of    the individual plaintiffs.

The complaint alleges that Prudential's discriminatory policies and practices caused damage to the Fair Housing Group plaintiffs because they were required to divert scarce resources away from activities of the organizations such as education, counseling and community outreach, in order to identify and counteract the discriminatory polices and practices. Compl. ¶ 73. In addition, the Fair Housing Group plaintiffs claim that, because of Prudential's conduct, they were required to devote time, resources and money toward efforts to educate past, present and prospective homeowners, as well as the general public, that discrimination in residential property insurance is illegal. *Id.* ¶ 74. The Fair Housing Group plaintiffs also contend that they were frustrated in their missions to eradicate discrimination in housing and home ownership, and in their efforts to carry out the programs and services that they provide, such as providing counseling services to persons looking for housing or affected by discriminatory housing practices. *Id.* ¶ 75. Finally, the organizational plaintiffs allege that they have suffered from Prudential's lack of equally available, competitively priced and high-quality homeowners insurance, and from the resulting decline in home values and home ownership by residents in predominantly African–American and Hispanic neighborhoods. *Id.* ¶ 76.

The D.C. Circuit, in assessing an organization's standing to sue under the Fair Housing Act, remarked that the issue of standing is "answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases." *Spann,* 899 F.2d at 29 (quoting *Allen v. Wright,* 468 U.S. 737, 751–52, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). In *Havens Realty,* HOME Richmond, one of the organizational plaintiffs in this matter, alleged that defendants' racial steering practices had frustrated its efforts to assist in providing equal access to housing through counseling and referral services. 455 U.S. at 379, 102 S.Ct. 1114. HOME Richmond also claimed that the defendants' conduct caused it to "devote significant resources to identify and counteract" the allegedly discriminatory steering practices. *Id.* In finding that these allegations, if true, left "no question" that the organization had suffered an injury in fact sufficient for standing purposes, the Supreme Court noted that the defendants' conduct had allegedly caused a "drain on the organization's resources—constitut[ing] far more than simply a setback to the organization's abstract social interests." *Id.*

Here, the Fair Housing Group plaintiffs have clearly alleged injury to their programs and activities. The organizations provide counseling and referral services, as did HOME Richmond in *Havens Realty.* The complaint alleges in detail that these services, as well as plaintiffs' educational programs, are burdened and harmed by the conduct of defendants. This is not a case where the only activity undertaken by the plaintiffs is the pursuit of Fair Housing Act litigation, which might arguably parallel the facts in *American Legal Foundation,* 808 F.2d at 91, or *Fair Employment Council of Greater Washington,* 28 F.3d at 1277.[3]

Finally, the defendants allege that the Fair Housing Group plaintiffs cannot assert an injury arising from "identifying and counteracting" alleged discrimination

3. In *American Legal Foundation,* the plaintiff organization unsuccessfully argued that it had an interest in seeing that the FCC policies were enforced and that an injury to this "institutional interest" was sufficient for standing purposes. 808 F.2d at 91. In *Fair Employment Council of Greater Washington,* the Circuit rejected an organization's argument that a legally sufficient injury in fact arose from its "testing" activities. 28 F.3d at 1277.

"because NFHA Plaintiffs are in the business of doing precisely that." Defs.' Mot. at 11. Defendants suggest that the fact that Fair Housing Group plaintiffs are funded through federal HUD grants and prior litigation settlements negates their assertion that scarce resources have been diverted to this litigation, the "very activit[y] that finance[s] substantially all of their operations." *Id.* at 3. They elaborate:

> [Plaintiffs] test and then sue insurers, and use HUD grants and litigation settlements to educate the public about discrimination. They cannot establish "injury" by circularly asserting that Prudential's alleged discrimination caused them to do what they have made millions of dollars doing over the past several years.

*Id.* at 11. Yet, defendants cite no legal authority for the proposition that plaintiff's use of funds recovered through litigation against other private defendants negates plaintiffs' injury and, at oral argument, defense counsel admitted that he knew of none.

The Court need not address defendants' theory that plaintiffs cannot be injured by the need to counteract discrimination because they have recovered funds to fight other sources of discrimination, an argument that borders both on the offensive and absurd. Defendants' argument is based on facts not contained within the complaint, and will not be considered in the Court's analysis of plaintiffs' standing at this stage in the proceedings.

In sum, the Fair Housing Group plaintiffs have sufficiently alleged an injury in fact caused by defendants' conduct. Plaintiffs allege that they have expended resources on counteracting Prudential's discrimination through their educational, counseling and referral programs. Plaintiffs' injury lies in their expenditure of scarce resources on identifying and counteracting discrimination.

## C. Fair Housing Act Claims

### 1. Fair Housing Act

All plaintiffs allege violations of the Fair Housing Act. Specifically, they allege that the defendants have violated 42 U.S.C. §§ 3604(a), 3604(b), and 3605(a)-(b)(1).

Section 3604 makes it unlawful:

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of or *otherwise make unavailable or deny,* a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the *provision of services or facilities in connection therewith,* because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604 (emphasis added). Furthermore, section 3605 makes it unlawful:

(a) [T]o discriminate in making available . . . a [residential real estate-related] transaction, or in the terms and conditions of such a transaction, because of race, color, religion, sex, familial status, or national origin.

(b) [T]he term "residential real estate-related transaction" means any of the following:

> The making or purchasing of loans or *providing other financial assistance—for purchasing, constructing, improving, repairing, or maintaining a dwelling* . . .

42 U.S.C. § 3605 (emphasis added). Plaintiffs contend that the emphasized portions of these provisions of the FHA are proper-

ly construed to prohibit racial discrimination in the sale of homeowners insurance.

### 2. Applicability of the FHA to Sale of Homeowners Insurance

The Supreme Court has indicated that the FHA should be broadly construed to effectuate its remedial purpose to foster "truly integrated and balanced living patterns." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211–12, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (quoting 114 Cong. Rec. 3422 (1968)). While neither the Supreme Court nor the D.C. Circuit has considered the question of whether the FHA should be extended to apply to the sale of homeowners insurance, other circuits have addressed this issue. The "split" of authority on this issue, however, is not as divided as the defendants portray it to be.

Prudential relies primarily on a Fourth Circuit case, *Mackey v. Nationwide Insurance Co.*, 724 F.2d 419 (4th Cir.1984), which held that FHA's prohibition on discrimination does not extend to the sale of homeowners insurance. In arguing that the FHA does cover the sale of homeowners insurance, plaintiffs rely on precedent from the Sixth Circuit, Seventh Circuit and district courts in Tennessee, Pennsylvania, Missouri and the District of Columbia. *See Nationwide v. Cisneros*, 52 F.3d 1351 (6th Cir.1995); *United Farm Bureau v. Metropolitan Human Relations Comm'n*, 24 F.3d 1008 (7th Cir.1994); *NAACP v. American Family*, 978 F.2d 287 (7th Cir.1992); *Wai v. Allstate Ins. Co.*, 75 F.Supp.2d 1, 5–8 (D.D.C.1999); *Lindsey v. Allstate Ins. Co.*, 34 F.Supp.2d 636 (W.D.Tenn.1999); *Strange v. Nationwide Mutual Ins. Co.*, 867 F.Supp. 1209 (E.D.Pa.1994); *Canady v. Allstate Ins. Co.*, 3 Fair Housing, Fair Lending, (P–H) (W.D.Mo. Oct. 2, 1996).

Plaintiffs argue that discrimination in the sale of homeowners insurance is prohibited by both section 3604 and section 3605 of the FHA.

#### i. Section 3604

■ The Court's analysis of whether plaintiffs have stated a claim pursuant to section 3604 turns on whether it is appropriate to rely on HUD regulations interpreting this section. In 1989, Congress enacted the Fair Housing Amendments Act of 1988, which permitted HUD to issue regulations implementing the FHA. That same year, HUD issued regulations that interpreted section 3604 of FHA to prohibit discrimination in the provision of insurance. *See* 54 Fed.Reg. 3232 (Jan. 23, 1989). Defendants' reliance on *Mackey*, 724 F.2d 419, is problematic because *Mackey* was decided in 1984, several years before HUD issued its regulations. No court since 1989 has followed *Mackey*'s holding that the FHA does not apply to the sale of homeowners insurance.

Plaintiffs argue that the 1989 HUD regulations clearly establish that the sale of homeowners insurance is covered by section 3604 of the FHA. The HUD regulations interpreting section 3604 provide that "[i]t shall be unlawful, because of race, color, ... or national origin, to engage in conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons." 24 C.F.R. § 100.70(b).[4] The regulation also sets out four specific types of activities prohibited by section 100.70(b), quoted above. One of the proscribed activities is:

> Refusing to provide property or hazard insurance for dwellings or providing such services or insurance differently

---

**4.** The regulation reflects the language found in section 3604 of the FHA regarding the prohibition of discrimination in the provision of "services" and of activities that would "otherwise make[] unavailable or den[y]" dwellings. 42 U.S.C. § 3604.

because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.70(d)(4).

■ Defendants contend that this Court need not consider the HUD regulations because the language of the FHA is clear and does not apply to the provision of insurance. In a footnote, the defendants dismiss several cases that have relied on *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to defer to HUD regulations in reaching their decisions, arguing that such reliance is misplaced. *Chevron* requires the Court should first consider whether Congress has spoken directly to the matter at hand: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43, 104 S.Ct. 2778. However, where the statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. In determining whether the agency's interpretation of the statute is permissible, a court need not find that the agency construction is the only available and permissible one, or even that it is the construction that the court might have reached absent agency's interpretation. *Id.* at 843 n. 11, 104 S.Ct. 2778.

Defendants' argument, essentially, is that the text of the FHA is clear. They cite *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446–48, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), for the proposition that *Chevron* did not intend for courts to defer to agency interpretation if Congressional meaning is clear. Defendants, however, fail to explain

where they find an unambiguous Congressional intent to exclude insurance providers from the FHA's coverage.[5]

Defendants attempt to resuscitate *Mackey* to make their case that Congressional intent is unambiguous. *Mackey* suggested that, to read section 3604 so broadly as to encompass the provision of insurance would make superfluous the more narrow prohibition of discrimination in types of financial transactions, set out in section 3605. Of course, defendants also contend that section 3605 does not apply to provision of insurance. Both the Sixth and the Seventh Circuit have rejected the argument that sections 3604 and 3605 may not overlap in their coverage. *See Nationwide Mut. Ins. Co.,* 52 F.3d at 1357; *American Family,* 978 F.2d at 298. Nothing in the structure or stated purpose of the FHA would support a conclusion that its provisions may not provide overlapping remedies. Rather, plaintiffs persuasively argue that it would have been unreasonable for Congress to include a laundry list of all possible housing-related transactions covered by the FHA, and that the broad, general language—reflected in phrases such as "otherwise make unavailable or deny"—was intended to be flexible enough to cover multiple types of housing-related transactions.

Defendants argue that section 3604's silence on whether it extends to homeowners insurance is an unambiguous Congressional statement that claims may not be brought against insurers. Yet, the language in section 3604 clearly leaves room for multiple interpretations of Congressional intent. Subsection (a) provides that persons may not "refuse to sell or rent..., or ... refuse to negotiate for the sale or rental of, or *otherwise make unavailable*

---

**5.** The Court also notes that, while on one hand defendants argue that the Congressional intent is clear, they also ask the Court to consider and draw inferences from the legislative history of several failed, proposed amendments to FHA.

*or deny,* a dwelling to any person because of race." 42 U.S.C. § 3604(a) (emphasis added). The statute envisions avenues other than sale and rental of dwellings that might thwart individuals' abilities to access housing. What constitutes conduct that would "make unavailable or deny ... a dwelling" is not clear from the statute.

Similarly, subsection (b) makes unlawful race-based discrimination against a person in "the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." 42 U.S.C. § 3604(b). While the phrase "provision of services and facilities" is less open-ended than the expansive phrasing of subsection (a), nothing in the statute reveals an unambiguous Congressional intent to limit interpretation of this phrase to a certain kind of services or facilities. Defendants do not attempt to rebut the reasoning of the Sixth and Seventh Circuits, which have found that the failure of the FHA to "define key terms such as 'service' and 'make unavailable'" makes unclear the Congressional intent regarding the application of section 3604 to insurance practices. *Nationwide Mut. Ins,* 52 F.3d at 1356; *American Family,* 978 F.2d at 298.

Rather, defendants rely on *Clifton Terrace Assocs., Ltd. v. United Techs. Corp.,* 929 F.2d 714, 719–20 (D.C.Cir.1991), where the D.C. Circuit listed examples of essential services relating to a dwelling, but did not include homeowners insurance. Yet, the *Clifton* court did not consider the issue of whether the language of section 3604 applies to homeowners insurance. *Clifton's* enumerated examples of services are just that—examples.

As the Seventh Circuit noted, section 3604 is written in the passive voice, neither identifying which actors are forbidden from engaging in the given conduct, or "how such actors bring about the forbidden consequence." *American Family,* 978

F.2d at 298. Rather, the section simply proscribes certain conduct. In short, the language of the statute reveals no clear Congressional intent on the issue before the Court—whether the provisions of 3604 apply to providers of insurance. Accordingly, the Court must consider whether HUD's regulations are a "permissible construction" of the FHA. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

■ A court should defer to an agency's interpretation if such interpretation is "reasonable and consistent with the statutory purpose." *Associated Gas Distribs. v. FERC,* 899 F.2d 1250, 1260 (D.C.Cir.1990). The Congressional intent underlying the FHA is to promote integrated housing patterns and to discourage discrimination in access to housing. *Trafficante,* 409 U.S. at 211–12, 93 S.Ct. 364. In prohibiting activities that would "deny or otherwise make unavailable" housing on account of someone's race, it is reasonable to conclude that Congress intended to prohibit discrimination in the provision of homeowners insurance, a prerequisite to home ownership for most people in the country. Similarly, it is not unreasonable to conclude that Congress' prohibition of discrimination in the provision of services related to the sale or rental of a dwelling extends to the provision of homeowners insurance. The application of the FHA to homeowners insurance is fully consistent with the statute's purpose in eliminating discrimination resulting in segregated housing and lack of equal housing opportunities. The Court finds that HUD's interpretation of section 3604 as set forth in its regulations is a permissible construction of the FHA, and, accordingly, that the scope of section 3604 extends to the provision of homeowners insurance.

#### ii. Section 3605

HUD has not promulgated regulations interpreting section 3605 and, thus, the

Court's interpretation of section 3605 is guided primarily by the language of the statute. Section 3605 pertains to financial transactions involving real estate. Specifically, the section prohibits discrimination "in making available" a residential real estate-related transaction, which is defined as "any of the following": "the making or purchasing of loans or providing other financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling." 42 U.S.C. § 3605.

Plaintiffs contend that the provision of insurance may constitute the provision of "financial assistance for purchasing, constructing, improving, repairing, or maintaining a dwelling." 42 U.S.C. § 3605. Defendants respond that section 3605 cannot logically be extended to cover the sale of homeowners insurance. They rely on the Seventh Circuit's decision in *NAACP v. American Family Mutual Insurance Co.* 978 F.2d at 297. There, the court held that plaintiffs' claim of discrimination in the sale of property insurance was not legally cognizable under section 3605. *Id.* The Court reasoned that it would "strain language past the breaking point to treat property or casualty insurance as 'financial assistance.'" *Id.; see also United States v. Massachusetts Indus. Fin. Agency,* 910 F.Supp. 21, 28 (D.Mass.1996) ("[a]n insurer does not provide a necessary conduit through which funds flow"). The *American Family* court noted that property insurance did not constitute a loan or "subsidy," thus narrowly construing the term "financial assistance." 978 F.2d at 297.

However, by defining a real estate-related transaction as one involving a loan or "*other*" financial assistance," section 3605 indicates that "financial assistance" includes loans, and thus should be construed more broadly than the traditional notion of a subsidy.

It is undisputed that individuals are often unable to purchase or to maintain financing for homes without homeowners insurance. Without property insurance, most homeowners are unable to repair their homes when and if disaster should strike. For these reasons, insurance provides the financial assistance necessary to maintain a dwelling. As such, it is reasonable to conclude the Congress intended that homeowners insurance fall within the scope of section 3605's protections.

### 3. Disparate Impact Claims

#### a. Availability of Disparate Impact Claims under the FHA

■ Defendants argue that disparate impact claims are not cognizable under the Fair Housing Act. However, plaintiffs note that every Circuit Court except the District of Columbia Circuit has held that disparate impact claims are cognizable under the FHA.[6] These courts have recognized that the premise of a disparate impact claim is that housing practices may operate in a manner that is "functionally equivalent to intentional discrimination." *Mountain Side Mobile Estates Partnership,* 56 F.3d at 1250–51.

---

**6.** *See, e.g., Casa Marie, Inc. v. Superior Court of Puerto Rico,* 988 F.2d 252, 269 n. 20 (1st Cir.1993); *United Stats v. Starrett City Assoc.,* 840 F.2d 1096, 1100 (2d Cir.1988); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 147–48 (3d Cir.1977); *Smith v. Town of Clarkton,* 682 F.2d 1055, 1065 (4th Cir.1982); *Simms v. First Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir.1996); *Arthur v. City of Toledo,* 782 F.2d 565, 574–75 (6th Cir.1986), *Metropolitan*

*Housing Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1290 (7th Cir.1977); *United States v. City of Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir.1974); *Keith v. Volpe,* 858 F.2d 467, 482–84 (9th Cir.1988); *Mountain Side Mobile Estates Partnership v. HUD,* 56 F.3d 1243, 1250–51 (10th Cir.1995); *Jackson v. Okaloosa County,* 21 F.3d 1531, 1543 (11th Cir.1994).

Ignoring the overwhelming precedent from other circuits, defendants urge this Court to follow a 1987 decision from this Court, which they allege plaintiffs have failed to distinguish. *See Brown v. Artery Org., Inc.,* 654 F.Supp. 1106 (D.D.C.1987). As an initial matter, the Court notes that the *Brown* decision was issued before many of the Circuit decisions that have found disparate impact claims to be actionable under the FHA.

*Brown* did not hold, as defendants contend, that disparate impact claims were never available under the FHA. Rather, *Brown* recognized that where there is evidence of discriminatory effect, courts have required plaintiffs to demonstrate varying degrees of discriminatory intent. *Id.* (citing *Betsey v. Turtle Creek Assocs.,* 736 F.2d 983, 986 (4th Cir.1984); *Village of Arlington Heights,* 558 F.2d at 1290–91; *Rizzo,* 564 F.2d at 147–48; *City of Black Jack,* 508 F.2d at 1184–85). The court fashioned a "sliding scale" of intent required: "the more devastating to minorities the effect or impact of the [defendant's] actions, the less evidence will be required of his actual intentions." *Id.* at 1116.

Defendants invoke the distinction drawn by *Brown* between claims against governmental defendants and non-governmental defendants. *Brown* held that FHA disparate impact claims were cognizable only if brought against governmental bodies. *Id.* at 1115. The court reasoned that to permit plaintiffs to bring disparate impact claims against non-governmental bodies without allegations of discriminatory intent would result in "far-reaching consequences" for private landlords and developers. *Id.* at 1116. Specifically, the Court suggested that to hold private parties liable for the racial effects of policies *"irrespective of their purpose or intent"* would render them responsible for effects over which they have no control and would halt private efforts to integrate housing. *Id.* (emphasis in original).[7] This logic is simply unconvincing in the instant case. Prudential clearly has control over the practices and policies at issue here. Furthermore, the Court foresees no adverse consequences for private efforts to integrate neighborhoods if disparate impact claims are recognized against Prudential.[8]

In addition to relying on *Brown,* defendants also argue that the Supreme Court has expressed its reluctance to extend disparate impact liability to other types of civil rights cases. However, the case relied upon by defendants, *Town of Huntington v. Huntington Branch, NAACP,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988), is a case in which the Court summarily affirmed a judgment against a town for refusing to amend an ordinance restricting private multifamily housing projects to a predominantly minority area, where the plaintiffs argued that the ordinance disparately impacted minorities. The

---

7. The Court notes that *Brown*'s distinction between governmental and non-governmental bodies finds no support in the language of the statute or in the legislative history.

8. *Brown* also failed to consider the effect of the "business necessity" defense to disparate impact claims. While contemplating the allegedly detrimental prospect that the residents of low-rent private housing predominantly populated by minorities would be entitled to judicial review of any "upgrading" of the housing that would have a disparate impact on minority residents, such a scenario excludes from the calculus the availability of the business justification defense. 654 F.Supp. at 1116. A landlord seeking to "upgrade" her or his apartment complex, could claim that she or he was motivated by economic profit. Under the standard burden-shifting employed in disparate impact cases, plaintiff's prima facie case only raises a presumption of discrimination, one which may be rebutted by a claim of business justification.

Court noted that the town did not contest the availability of a disparate impact claim under the FHA, and thus it assumed that such a claim was cognizable. *Id.* at 18, 109 S.Ct. 276. *Huntington* in no way suggests that it would be error for courts to consider disparate impact claims under the FHA—especially in light of the fact that, at the time the case was decided, several of the circuits had already held that FHA disparate impact claims were cognizable. While defendants argue that *Hazen Paper*, 507 U.S. at 610, 113 S.Ct. 1701, also suggests the Supreme Court's hesitancy to extend the disparate impact doctrine, that case concerned the Age Discrimination in Employment Act, a statute that differs significantly in structure from the FHA and Title VII.

Finally, Prudential makes the sweeping argument that "[r]isk discrimination is not race discrimination." Defs.' Mot. at 20 (citing *American Family*, 978 F.2d at 290). Essentially, this argument turns on the purportedly unique nature of the insurance industry, which must "discriminate" based on an assessment of risk. However, this argument is unavailing in light of the availability of the "business justification" defense. Plaintiffs do not challenge Prudential's right to evaluate homeowners insurance risks fairly and objectively. Rather, plaintiffs allege that the underwriting policies and practices employed by Prudential are *not* purely risk-based. Furthermore, defendants cannot point to anything in the FHA itself that would justify this Court in carving out an exception for a particular type of organization.

### b. Failure to State a Disparate Impact Claim

Courts have applied the basic burden-shifting scheme used to review disparate impact claims brought under Title VII, 42 U.S.C.1973c, to disparate impact claims brought pursuant to FHA. *See, e.g.,*

*Williams v. Matthews Co.*, 499 F.2d 819, 825 (8th Cir.1974) ("We think that the concept of the 'prima facie case' applies to discrimination in housing as much as to discrimination in other areas of life."). To succeed on a disparate impact claim, plaintiff has the threshold burden of showing a discriminatory effect or impact on members of a class protected by Title VIII. *Casa Marie, Inc.*, 988 F.2d at 269 n. 20; *Huntington Branch, NAACP*, 844 F.2d at 933, 934. The First Circuit has suggested that, "although *direct* proof of the defendant's discriminatory intent is not essential for purposes of Title VIII, ... plaintiff may *bolster* the evidence of discriminatory effect by introducing direct evidence...." *Casa Marie, Inc.*, 988 F.2d at 269 n. 20 (emphasis in original). The Eighth Circuit suggests that a *prima facie* inference of discrimination may be drawn where the plaintiff establishes that she or he is a member of a protected class, meets the objective criteria for a good or a service and yet was denied that good or service, and produces statistics showing that the majority of like goods or services are provided to whites. *Williams*, 499 F.2d at 825. Once plaintiff has established a *prima facie* case of discriminatory effect, the burden shifts to the defendant to advance some legitimate and nondiscriminatory reason for her or his actions.

Defendants allege that plaintiffs have failed to state a disparate impact claim because they have not alleged sufficient statistical data to support their claim. Defendants contend that plaintiffs "arbitrarily" defined predominantly minority communities as those with over 50% minority residents. Yet, plaintiffs put forth data from the most recent U.S. census that support their allegation that the residential housing patterns in the geographical areas served by the plaintiff organizations are highly segregated. At this stage in the proceedings, plaintiffs have alleged more

than adequate facts to support their disparate impact claim. *See, e.g., Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d at 938 (zoning decision affecting 28% of area's minorities compared to 11% of whites "created a strong prima facie showing of discriminatory effect").

### c. Laches

■ Defendants argue that plaintiffs' claim in Count I, unlawful discrimination under the FHA, should also be barred under the equitable doctrine of laches because plaintiffs unreasonably delayed filing this lawsuit. Specifically, defendants claim that Fair Housing Group plaintiffs, with the exception of FHCSP, filed a complaint with HUD more than four years ago and then waited an unreasonably long period of time before filing this case. However, the FHA expressly tolls the statute of limitations while an administrative proceeding is pending with respect to a fair housing complaint or charge. *See* 42 U.S.C. § 3613(a)(1)(B). Thus, there is no "equitable" reason to bar plaintiffs from bringing their claims.

### d. Primary Jurisdiction

■ Defendants, in footnote 20 of their memorandum in support of their motion to dismiss also argue that the Court should defer to state agencies that regulate the insurance industry. This argument was one of the primary arguments of the insurance company in the *Travelers* case before Judge Robertson. *See* Defs.' Mot. to Dismiss, at 33–39, filed Aug. 25, 2000, in *National Fair Housing Alliance, Inc. v. Travelers Property Casualty Corp.,* Civil Action No. 00–1506 (D.D.C.). Essentially, the defendants' argument is a version of the regularly rejected argument that state insurance laws take primacy over the Fair Housing Act under the McCarran–Ferguson Act, which establishes a form of "inverse preemption," "letting state law prevail over general federal rules—those that

do not 'specifically relate[ ] to the business of insurance.'" *American Family,* 978 F.2d at 293; *Nationwide Mut. Ins. Co.,* 52 F.3d at 1360–61. However, the Supreme Court has long held that it would defeat the purposes of providing a federal remedy for discrimination if the "assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state" proceeding. *McNeese v. Board of Educ. for Com. Unit. Sch. Dist.* 187, 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). Furthermore, the primary jurisdiction doctrine is inapplicable where, as here, an administrative agency is without authority to grant the relief requested. *See Randolph–Sheppard Vendors of Am. v. Weinberger,* 795 F.2d 90, 107 (D.C.Cir. 1986) (finding that there is no need to exhaust administrative remedies where, considering all of the agency's potential means of remedying the claimed violation, any relief provided will be inadequate). Therefore, defendants' primary jurisdiction argument also fails.

### D. Section 1981 Claims

### 1. Sufficiency of Individual Plaintiffs' Claims

■ Defendants argue that the individual plaintiffs do not sufficiently allege section 1981 claims. However, the plaintiffs clearly allege that their applications for homeowners insurance were denied because Prudential discriminated against them on the basis of race. The complaint alleges that the individual plaintiffs suffered "intentional discrimination on the basis of race or color." Compl. ¶ 16. Under *Sparrow,* 216 F.3d at 1111, and *Swierkiewicz,* 122 S.Ct. at 996, such allegations are sufficient to survive a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).

### 2. Statute of Limitations

Defendants argue that the statute of limitations bars plaintiffs' claims relating

to alleged conduct that occurred more than three years ago. According to Prudential, the period commenced to run for the individual plaintiffs' claims in February 1998, December 1997 and July 1997. Prudential contends that the District of Columbia's three-year general statute of limitations should apply. Plaintiffs argue that the applicable limitations statute is four years and is set by Ohio's general statute of limitations. *See Prohazka v. Ohio State Univ. Bd. of Trustees*, No. 99AP–2, 1999 WL 1189306 (Ohio Ct.App., Dec. 16, 1999) (finding that "R.C. 2305.09(D) [, a four-year statute of limitations,] is Ohio's general or residual personal statute of limitations" for purposes of 42 U.S.C. § 1983). Thus, if plaintiffs are correct that the Ohio general state of limitations applies, two of the dates in question fall within the four-year period.

The Supreme Court has instructed that courts should apply a state's general or residual personal injury statute of limitations to claims brought under section 1981. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) (courts should apply most analogous state statute of limitations); *Owens v. Okure*, 488 U.S. 235, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) (clarifying that most analogous state statute of limitations is the state's general or residual personal injury statute of limitations). The question, of course, is whether this Court should look to the District of Columbia or to Ohio for the appropriate statute of limitations.

■ Where federal question jurisdiction is invoked, as here, federal courts generally apply federal common law principles to resolve choice of law disputes. *See Alvarez–Machain v. United States*, 266 F.3d 1045, 1061 (9th Cir.2001); *A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458, 1463–64. Federal common law follows the approach of the Restatement (Second) of Conflicts of Laws. *Id.* The Restatement provides a list of factors that courts may consider in ascertaining the appropriate rule of law, one of which is the "relative interests" of the fora in resolution of the particular issue.[9] However, for personal injury claims, the Restatement states that "there is a presumption that the law of the place where the injury occurs applies." *See* Restatement (Second) of Conflicts § 146. While the Supreme Court has indicated that courts should look to state tort law for statutes of limitations, this is not determinative of the conflict of law issue. In any event, the State of Ohio would clearly have an interest in remedying an injury to the individual plaintiffs.

The Court is mindful that the parties have not fully briefed this choice of law issue. However, for purposes of deciding defendants' motion to dismiss, the Court need not now determine which statute of limitations applies to the individual plaintiffs' section 1983 claims. The Court must accept as true plaintiffs' allegations contained in the complaint. Plaintiffs clearly plead the existence of continuing violations. They allege a continuing pattern and practice of intentional conduct. *See*

9. The Restatement's factors include:
   (a) the needs of the interstate and international systems,
   (b) the relevant policies of the forum,
   (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
   (d) the protection of justified expectations,
   (e) the basic policies underlying the particular field of law,
   (f) certainty, predictability and uniformity of result, and
   (g) ease in the determination and application of the law to be applied.
   Restatement (Second) of Conflicts § 6.

Compl. ¶ 81. In *Havens Realty*, the Supreme Court explained that plaintiffs may timely challenge a violation of the FHA that "continues" into the limitations period. 455 U.S. at 390–91, 102 S.Ct. 1127. Here, plaintiffs allege that defendants' intentional discrimination in violation of section 1981 and plaintiffs' injury has continued into the limitations period.[10] Thus, defendants' statute of limitations challenge to the section 1981 claims must fail.

### CONCLUSION

The Court has carefully considered the arguments made in Prudential's motion to dismiss and finds none of them to be persuasive. Prudential's standing argument misconstrues plaintiffs' allegations and, to the extent it attempts to suggest that plaintiffs only profit from investigating and counteracting discrimination, is based on facts not contained in the complaint.

Plaintiffs have sufficiently stated claims under section 3604 and section 3605 of the FHA. The Court finds that the language of section 3604 is ambiguous and that the HUD regulations defining the sale of homeowners insurance as an activity covered by section 3604 constitute a permissible construction of the FHA, and are due deference. The Court also finds that section 3605 is reasonably construed to apply to the provision of homeowners insurance. Finally, the individual plaintiffs clearly state claims under section 1981 by alleging continuing violations of their rights under that statute.

For the foregoing reasons, and upon careful consideration of defendants' motion to dismiss, the response and reply thereto, oral argument of counsel heard by the

Court on June 7, 2002, and the applicable statutory and case law, it is hereby

**ORDERED** that the defendants' motion to dismiss is **DENIED**.

**IT IS SO ORDERED.**

---

**10.** One of the individual plaintiffs, Ms. Alsup, apparently has moved away from Toledo, Ohio. To the extent that the individual plaintiffs assert a continuing injury from living in segregated neighborhoods of Toledo, Ohio that are not served or served in a discriminatory manner by defendants, Ms. Alsup's injury may well have terminated when she left Toledo. However, the complaint is silent with respect to when Ms. Alsup left Toledo. Thus, the Court relies solely on the complaint's allegation that the individual plaintiffs' injuries continued into the statutory period.